NOTICE

*The text of this opinion can be corrected before the opinion is published in the Pacific Reporter. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

RYAN MICHAEL THOMAS BROWN,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-12068
Trial Court No. 1KE-13-662 CR

O P I N I O N

No. 2562 — August 18, 2017

Appeal from the Superior Court, First Judicial District, Ketchikan, William B. Carey, Judge.

Appearances: Callie Patton Kim, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant. Stephen R. West, District Attorney, Ketchikan, and Craig W. Richards, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Suddock, Superior Court Judge. [*]

Judge SUDDOCK, writing for the Court.
Judge MANNHEIMER, concurring.

Ryan Michael Thomas Brown pleaded guilty to one count of distribution of child pornography after authorities discovered files containing child pornography on

_____

[*] Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

his computer. On appeal, he challenges the superior court's rejection of his proposed statutory mitigator — that combat-related post-traumatic stress disorder (PTSD) significantly affected his conduct. For the reasons explained below, we agree that the mitigator applies to his case and we therefore vacate Brown's sentence and remand this case to the superior court for resentencing.

*Relevant factual background*

The State charged Brown with eight counts of distribution of child pornography and one count of possession of child pornography[1] after authorities discovered twenty-four files containing child pornography on his computer. Pursuant to a plea agreement, Brown pleaded guilty to one count of distribution of child pornography. The plea agreement left Brown's sentence open to the discretion of the sentencing judge.

Prior to sentencing, Brown gave notice that he intended to rely on the combat-related PTSD mitigator codified in AS 12.55.155(d)(20)(B). This mitigator provides a sentencing judge authority to impose a sentence below the presumptive range if:

> [T]he defendant committed the offense while suffering from a condition diagnosed ... as combat-related post-traumatic stress disorder ... , the combat-related post-traumatic stress disorder ... substantially impaired the defendant's judgment, behavior, capacity to recognize reality, or ability to cope with ordinary demands of life, and the combat-related post-traumatic stress disorder ... , though insufficient to constitute a complete defense, significantly affected the defendant's conduct[.]

---

[1]  AS 11.61.125 and AS 11.61.127, respectively.

For purposes of this mitigator, combat-related PTSD is defined as PTSD that results from "combat with an enemy of the United States in the line of duty while on active duty as a member of the armed forces of the United States[.]"[2]

Superior Court Judge William B. Carey held a sentencing hearing on July 25, 2014. At the hearing, Brown testified that he had been diagnosed with PTSD after a tour of duty in Iraq. During the tour, Brown was struck by numerous explosive devices, and he witnessed civilians and soldiers die — including his best friend. Brown testified that he continued to have nightmares associated with these experiences as well as extreme anxiety.

After serving his tour in Iraq, Brown elected to engage in a second tour, during which he was stationed at a base in Kuwait. According to Brown, one night while at this base he went outside at around 2 a.m. to smoke a cigarette. A Kuwaiti man approached him to ask for a cigarette, and Brown obliged. Another man grabbed Brown from behind and pushed him to the ground. Three Kuwaiti men then sexually assaulted him.

Brown testified that he only began to view child pornography after this sexual assault. He initially felt "disgusted" viewing the images. But he continued because he "felt a need to regain control" and a need to feel less powerless.

Brown underwent a psychiatric evaluation by Dr. Mark McClung. At the sentencing hearing, Dr. McClung testified that Brown suffered from PTSD as a result of his combat experiences in Iraq, as well as from the sexual assault. Dr. McClung believed that Brown's viewing of child pornography was related to his PTSD, that this PTSD was treatable, and that once the PTSD was resolved, Brown's risk of recidivism was far less than average. Dr. McClung also explained that "[e]xtra pornography use or even

---

[2]   AS 12.55.155(d)(20)(B).

compulsive pornography use is pretty common with men with PTSD" because pornography serves as an escape mechanism.

On cross-examination, Dr. McClung testified that Brown's viewing of child pornography was directly related to the sexual assault in Kuwait. But Dr. McClung added that "people who have had PTSD before tend to be at greater risk for what we call reactivation of symptoms with a new trauma," and he explained that Brown's PTSD symptoms originated from his combat experience in Iraq and were reactivated and exacerbated by the later sexual assault in Kuwait.

At the close of the sentencing hearing, Judge Carey found that Brown suffered combat-related PTSD as a result of his experiences in Iraq. The judge also found that the sexual assault in Kuwait occurred as Brown had described. But the judge concluded that the viewing of child pornography did not relate to any *combat-related* PTSD suffered by Brown:

> [T]he only combat-related post-traumatic stress had to do with his earlier service. That may have been exacerbated by the incident here in Kuwait, probably. But the — but that was not the cause of the incident. Nothing about the post-traumatic stress that he suffered as a direct result of combat had anything to do with his downloading child pornography. I accept that the incident in Kuwait did [cause or relate to Brown's downloading child pornography]. But that's not combat-related post-traumatic stress.

Judge Carey imposed a sentence of 7 years with 5 years suspended (2 years to serve), and 7 years' probation.

This appeal followed.

*Why we conclude that the superior court erred in rejecting the proposed mitigator*

On appeal, Brown argues that the superior court erred in rejecting his proposed mitigator. The determination of whether a statutory mitigator applies to a given set of facts requires a two-step process. First, the sentencing judge must assess the nature of the defendant's conduct; this Court reviews that assessment for clear error.[3] Second, the sentencing judge must "make the legal determination of whether that conduct falls within the statutory standard" — a legal question that we review de novo.[4]

Brown argues that the court erred in failing to catagorize the incident in Kuwait as "combat-related" within the meaning of AS 12.55.155(d)(20)(B). Brown urges us to adopt a broad interpretation of the term "combat-related" to include all activities of "those serving support roles in combat zones."

Brown's claim presents a question of statutory interpretation. "When interpreting a statute, the court's role is to ascertain the legislature's intent and then to construe the statute so as to implement that intent."[5] Courts are to interpret statutes "according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its purpose."[6] Further, where there is an ambiguity in the definition of a word or phrase, "Alaska courts apply a sliding scale approach to statutory interpretation, which considers the legislative history of a statute

---

[3]   *Michael v. State*, 115 P.3d 517, 519 (Alaska 2005).

[4]   *Id.*

[5]   *Williams v. State*, 2015 WL 4599554, at \*3 (Alaska App. July 29, 2015) (unpublished) (citing *Y.J. v. State*, 130 P.3d 954, 959 (Alaska App. 2006)).

[6]   *ARCTEC Servs. v. Cummings*, 295 P.3d 916, 920 (Alaska 2013).

and whether that history reveals a legislative intent and meaning contrary to the plain meaning of the statute."[7]

As we explained above, AS 12.55.155(d)(20)(B) defines the term "combat-related post-traumatic stress disorder" as "post-traumatic stress disorder ... resulting from combat with an enemy of the United States in the line of duty while on active duty as a member of the armed forces of the United States."

Webster's Dictionary defines "combat" as "armed fighting; battle" or "any struggle or conflict; strife."[8] These definitions suggest that the word "combat" refers specifically to physically engaging in the act of fighting against an enemy — thus tending to undermine Brown's broader interpretation. But as we have previously explained, "[i]dentifying the 'plain meaning' of a word or phrase used in a regulation does not end the process of statutory construction."[9]

We thus turn to the statute's legislative history. At a March 11, 2014 meeting of the House Special Committee on Military and Veterans' Affairs, the committee members heard public testimony on the proposed mitigator.[10] Ric Davidge, Director of Vietnam Veterans of America, Alaska, offered his support for the bill.[11] Representative Max Gruenberg asked Davidge whether the term "combat-related" is limited to those under enemy fire, since others can acquire PTSD from stressful and

_____

[7]    *Liddicoat v. State*, 268 P.3d 355, 360 (Alaska App. 2011).

[8]    *Combat*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY (5th ed. 2014).

[9]    *Beltz v. State*, 980 P.2d 474, 476 (Alaska App. 1999) (quoting *Millman v. State*, 841 P.2d 190, 194 (Alaska App. 1992)).

[10]   Minutes of House Special Comm. on Military and Veterans' Affairs, House Bill 313, 1:24:25 - 2:03:13 p.m. (Mar. 11, 2014).

[11]   *Id.* at 1:24:25 - 1:30:09 p.m.

dangerous assignments.[12]  Davidge responded that "service members who are in a combat theatre are eligible for consideration for combat-related PTSD, because anyone in a combat situation deals with an enormous amount of stress."[13]

The committee held a second meeting on March 20, 2014.  During the meeting, the representatives discussed expanding the mitigator so that it applied to all "service-related" PTSD.[14]  But a number of representatives expressed concern that the mitigator could then apply to situations unrelated to combat situations.[15]  For example, one representative suggested that the amended version could apply to a defendant who suffered PTSD as a result of an off-base car accident occurring while the defendant was working a desk job in the United States.[16]  The committee ultimately rejected the amendment.[17]

The committee then heard further public testimony.  Michael Kocher, a veteran from Eagle River, testified in support of the bill.[18]  Kocher explained that, under the policies of the Department of Veterans' Affairs, a person is considered a "combat veteran" any time they are deployed to a combat zone — even if the person "never left the base," or did not directly encounter enemy forces.[19]

---

[12]  *Id.* at 1:33:09 - 1:36:49 p.m.

[13]  *Id.*

[14]  Minutes of House Special Comm. on Military and Veterans' Affairs, House Bill 313, 1:06:36 - 1:11:04 p.m. (Mar. 20, 2014).

[15]  *Id.* at 1:27:14 - 1:52:19 p.m.

[16]  *Id.* at 1:20:06 - 1:22:31 p.m.

[17]  *Id.* at 1:20:06 - 1:53:31 p.m.

[18]  *Id.* at 1:53:45 - 1:56:02 p.m.

[19]  *Id.*

Representative Dan Saddler responded to Kocher's comments:

> You have answered a very important question for all of us in the committee and for the sponsors, to say pointedly that, if you were in Iraq in the sandbox, almost no matter where you were, you were considered combat-related and therefore any PTSD generated there would be covered by the bill as it currently sits before us. I very much appreciate that clarification.[20]

Representative Les Gara — the bill's sponsor — added:

> Mr. Kocher's testimony, I think, complies with our intent. And if it complies with the committee's intent I think that would be helpful if any litigation were to ever come up, that the committee also intends it to cover what Mr. Kocher defined as the military's definition of combat-related.[21]

The committee then voted to move the bill forward as originally drafted.[22]

Thus, when the legislature limited the mitigator to PTSD "resulting from combat," it intended to include soldiers who suffered PTSD as a result of events occurring while they were stationed in a combat zone, even though the triggering events were not direct combat.

Based on our review of this legislative history, we conclude that the superior court erred when it concluded that Brown's sexual assault in Kuwait could not be considered "combat-related." The court had found that Brown was sexually assaulted while stationed at a military base in Kuwait, and that Kuwait was part of a combat zone

---

[20]   *Id.* at 1:56:06 - 1:56:33 p.m.

[21]   *Id.* at 1:56:30 - 1:56:56 p.m.

[22]   *Id.* at 2:01:45 p.m.

at that time.[23] In addition, the superior court found that Brown's sexual assault led to his downloading of child pornography. Given these facts, we conclude that the court erred in rejecting the proposed mitigator.

We note another issue in the case. The defense expert witness, Dr. McClung, testified that Brown's PTSD symptoms were originally caused by Brown's combat experiences in Iraq. Dr. McClung further testified that the sexual assault on Brown in Kuwait, a different combat theater, both reactivated and exacerbated Brown's PTSD symptoms.

Because we conclude that Brown's post-traumatic stress from the sexual assault in Kuwait was "combat-related" for purposes of this mitigator because Kuwait was a combat zone, we need not reach Brown's alternative claim that his sexual assault was causally related to combat because it "reactivated" or exacerbated the post-traumatic stress that he suffered from his combat experience in Iraq.

*Conclusion*

We REMAND Brown's case for resentencing consistent with this opinion.

---

[23] *See* Exec. Order No. 12,744, 56 Fed. Reg. 2,663 (Jan. 23, 1991) (designating Kuwait as a "combat zone").

Judge Mannheimer, concurring.

I agree with my colleagues that, given the evidence in this case, Brown's post-traumatic stress disorder falls within the category of "combat-related" as the legislature understood that phrase when they created mitigator AS 12.55.155(d)(20)(B). I write separately because I question whether the legislature can validly limit the mitigating effects of post-traumatic stress disorder to instances where the disorder is combat-related.

There is no doubt that our country owes a debt of gratitude to all the men and women who volunteer to serve in the armed forces, and especially to those who are deployed in combat zones. And it is completely proper for the legislature to recognize that post-traumatic stress disorder can significantly alter a person's behavior, and that this disorder can mitigate the blameworthiness of criminal conduct.

But I question whether the legislature can validly limit the mitigating effects of PTSD solely to defendants whose disorder arises from military service in combat zones.

Many people serve our society in occupations that are fraught with danger. For example, in *Kelly v. Alaska Department of Corrections*, 218 P.3d 291 (Alaska 2009), our supreme court dealt with a case where a corrections officer succumbed to post-traumatic stress disorder after an incident in which he was threatened with serious physical injury, and possible death, by an inmate who had been convicted of murder and who was armed with a weapon.

For purposes of assessing a criminal defendant's degree of blame-worthiness, the pertinent questions are whether the defendant's criminal behavior was significantly influenced by PTSD, and whether the blameworthiness of the defendant's crime is therefore mitigated. In answering these questions, the origin of the defendant's

disorder — whether through service in the military, or through service in a police or fire department, or through service as a corrections officer, or otherwise — seems to have no particular relevance.

The equal protection clause of the Alaska constitution (Article I, Section1) limits the power of the legislature to draw distinctions among groups of people, by requiring equal treatment of people who are similarly situated.

In AS 12.55.155(d)(20)(B), the legislature has taken the group of defendants whose behavior was affected by PTSD and divided them into two groups — those whose PTSD arises from military service in a combat zone, and those whose PTSD arises from other causes. When the legislature enacts this kind of law, courts must identify the legislature's reasons for treating the two groups differently, and evaluate those reasons against the importance of treating the two groups equally.

Our supreme court has enunciated a three-part test for performing this analysis. [1] But with respect to mitigator (d)(20)(B), the real question is whether the goals of sentencing and the policies of the criminal law justify the legislature's distinction between PTSD arising from military service in a combat zone and PTSD arising from other causes.

It appears to me that, for purposes of assessing the blameworthiness of criminal conduct committed by a person who suffers from PTSD, there is no valid distinction between a defendant whose PTSD arises from military service in a combat zone and a defendant whose PTSD arises from other causes.

---

[1]    *See Alaska Pacific Assurance Co. v. Brown*, 687 P.2d 264, 269-270 (Alaska 1984).